## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

SHAWN TIMOTHY KINSER,

      **Plaintiff,**

v.                                       **Case No. 1:16cv8**
                                           **(Judge Keeley)**

KAREN PSZCZOLKOWSKI, Warden;
JOANIE HILL, Associate Warden of
Operations; AMANDA SABTINO, Wexford
Health Sources, Inc. Nurse; KRISTI
MUSILLI, Nurse Practitioner; SHERRI
JOHNSON, M.D.; THOMAS SCHMITT,
M.D.; JAMIE LEE, Medical Administrator;
KELLY STRICKLAND, Aramark Supervisor;
JIM RUBENSTEIN, Commissioner of
West Virginia Division of Corrections; and
JOSEPH THORNTON, Cabinet Secretary
of Department of Military Affairs and Public
Safety,

      **Defendants.**

## REPORT AND RECOMMENDATION

### I. Procedural History

Shawn Timothy Kinser ("Kinser"), the *pro se* Plaintiff, an inmate at Mt. Olive Correctional Center ("MOCC") in Mt. Olive, West Virginia initiated this action on January 14, 2016 by filing a civil rights complaint pursuant to 42 U.S.C. §1983 [ECF No. 1], along with a motion to appoint counsel [ECF No. 3], a motion to proceed *in forma pauperis* ("IFP") [ECF No. 4] and the supporting documents to the same. ECF Nos. 5 & 6.

By separate Orders entered January 20, 2016, the plaintiff's motion for appointed counsel was denied and he was granted permission to proceed IFP but directed to pay an initial partial filing fee. ECF Nos. 8 & 9. Plaintiff filed a second motion for appointed counsel on February 8, 2016 [ECF No. 12]; it was denied by Order entered the next day. ECF No. 13.

On February 19, 2016, Plaintiff filed a Motion Requesting Leave to File an Amended Complaint [ECF No. 17] along with a motion to exceed the page limits. ECF No. 18. Attached to the motion to amend was a proposed amended complaint and an 8-page memorandum in support, with various attachments.

Because Plaintiff did not pay his IPFF within the prescribed time, by Order entered February 29, 2016, he was directed to show cause why his case should not be dismissed. ECF No. 22. On March 4, 2016, Plaintiff paid the initial partial filing fee and filed a response to the show cause order. ECF Nos. 24 & 25. By separate Orders entered March 16, 2016, Plaintiff's motion to amend the complaint and the motion to exceed the page limits were granted. ECF Nos. 26 & 28. The proposed amended complaint was docketed separately as the Amended Complaint. ECF No. 27. Upon further review, it was later discovered that the amended complaint was unsigned.

On March 17, 2016, upon a preliminary review of the file, the undersigned determined that summary dismissal was not appropriate, and directed the United States Marshal Service to serve the Amended Complaint. ECF No. 29. On April 13, 2016, defendants Joanie Hill ("Hill"), Karen Pszcolkowski ("Pszcolkowski"), Jim Rubenstein ("Rubenstein"), and Joseph Thornton ("Thornton") filed a Motion to Dismiss with a memorandum of law in support. ECF No. 34. Because plaintiff was proceeding *pro se,* on April 18, 2016, a Roseboro Notice was issued, advising plaintiff of his right to respond to the defendants' dispositive motion. ECF No. 36.

On May 6, 2016, defendants Sherri Johnson ("Johnson"), Jamie Lee ("Lee"), Kristi Musilli ("Musilli"), Amanda Sabatino ("Sabatino"), and Thomas Schmitt ("Schmitt") filed a Motion to Dismiss. ECF No. 49. Another Roseboro Notice was issued. ECF No. 51.

On May 19, 2016, plaintiff filed a response styled as "Plaintiff's Response to Defendant's [sic] Motion to Dismiss and Memorandum of Law." ECF No. 54. On May 13, 2016, Hill, Pszcolkowski, Rubenstein and Thornton filed a reply to plaintiff's response. ECF No. 53.

On May 20, 2016, defendant Kelly Strickland ("Strickland") moved for an extension of time to respond to the amended complaint. ECF No. 56. By separate Orders entered May 23, 2016, Strickland's extension was granted and the Clerk was directed to provide the plaintiff with a copy of his original and amended complaint. ECF Nos. 57 & 58. On May 25, 2016, Strickland filed a Motion to Dismiss, attaching as an exhibit a copy of the WVDOC Inmate Grievance Procedures. ECF Nos. 59 & 59-1.

On May 31, 2016, plaintiff filed an unsigned response to Johnson, Lee, Musilli, Sabatino, and Schmitt's dispositive motion. ECF No. 62. A third <u>Roseboro</u> Notice was issued the same day, advising plaintiff of his right to respond to Strickland's dispositive motion. ECF No. 63. On June 23, 2016, plaintiff filed an unsigned response to Strickland's dispositive motion. ECF No. 65.

By Order entered June 28, 2016, the plaintiff was directed to re-file signed copies of his amended complaint, his responses to Johnson, Lee, Musilli, Sabatino, and Schmitt's dispositive motion, and his response to Strickland's dispositive motion. ECF No. 66.

On July 5, 2016, plaintiff refiled the signed copies of his amended complaint, his responses to Johnson, Lee, Musilli, Sabatino, and Schmitt's dispositive motion, and his response to Strickland's dispositive motion. ECF Nos. 68, 70 & 71. That same day, Strickland filed a reply to Plaintiff's response to her dispositive motion. ECF No. 72.

Accordingly, this case is before the undersigned for review, report and recommendation pursuant to LR PL P 2.

## II. <u>Contentions of the Parties</u>

**A. The Amended Complaint**

Plaintiff's amended complaint alleges eighteen claims, which can be condensed into two claims of deliberate indifference, for the denial of an uninterrupted specialized diet for his self-prescribed soy food allergy and for the defendants' failure to adequately treat his medical symptoms that occurred as a result, while incarcerated at the Northern Correctional Facility ("NCF"). Specifically, Plaintiff alleges "negligence, deliberate indifference, [and] medical malpractice, among various other things;" [ECF No. 68 at 15] violations of his 8th and 14th Amendment rights [id. at 9 and 12 - 13]; violations of "prison keylaw 17, keynote [sic] 6 and 8 [id. at 12]," "Keynote 8 of prison Keylaw 17 [id. at 11 & 12]," and WVDOC Policy 410.02 [id. at 10], arising out of his soy food allergy, for which he contends that although he was he was prescribed a no-soy diet several times [id. at 9 – 10, 12 – 13], it was later repeatedly "pulled" for "no reason." Id. at 9.

Plaintiff contends he has suffered severe "physical, mental and emotional torture [id.];" was subjected to cruel and unusual punishment and suffered mental anguish as a result of being jeered at by various correctional officers regarding his allergy. Id. He avers that he has developed a fear of eating any and all processed foods which will likely stay with him even after he is released from prison, rendering him "scarred for life." Id. at 16.

Plaintiff maintains that he has exhausted his administrative remedies with regard to these claims. Id. at 4 – 5.

As relief, the Plaintiff seeks $100,000.00 in compensatory damages jointly and severally from each defendant; $100,000.00 in "exemplary damages" [sic] jointly and severally from each defendant; $100,000.00 in punitive damages [sic] jointly and severally from each defendant; the "exact financial amount of EVERY deposit that has been placed in and onto the Plaintiff's financial spending account throughout . . . [his] stay in the WVDOC starting at 3-14-14 [sic]. . . asking for this

total amount from EACH individual Defendant, for EQUITABLE RELIEF [sic] both jointly and severally." Plaintiff also seeks a jury trial; appointed counsel; costs and attorney fees; and specifically requests that the attorney fees "be paid by the Defendants and NOT from the winnings of Plaintiff." <u>Id</u>. at 17.

Plaintiff also seeks injunctive relief in the form of an Order directing that he be immediately transferred to St. Marys Correctional Center ("SMCC") for the remainder of his WVDOC stay, to be housed on either SMCC's medical unit or its "Sheltered Housing Unit," so that he will receive adequate medical treatment; a "renal diet" of no processed foods for the remainder of his WVDOC incarceration. Further, he request more soy-free foods be added to the commissary list to provide Plaintiff and other inmates like him with a greater variety of foods "including but not limited to soy free fish and seafood products." <u>Id.</u>

## B. <u>Defendants Hill, Pszcolkowski, Rubenstein, Thornton's ("Corrections Defendants") Motion to Dismiss</u>

In their memorandum in support of their motion to dismiss, the Corrections Defendants assert that the amended complaint should be dismissed because

1) the court lacks subject matter jurisdiction over Plaintiff's claims;

2) the Eleventh Amendment precludes suit against defendants Hill, Pszcolkowski, Rubenstein, Thornton (hereinafter "Corrections Defendants");

3) the State of West Virginia and its agencies are entitled to sovereign immunity;

4) Plaintiff's claims against the Corrections Defendants fail, because Plaintiff has not alleged facts sufficient to state a claim against them;

5) the Corrections Defendants are not amenable to suit under § 1983 because they are officials who were acting in their official capacity;

6) the Corrections Defendants are entitled to qualified immunity;

7) Plaintiff's request for punitive damages must fail, because such is prohibited against a State agency and its employees;

8) Plaintiff's medical malpractice claims fail as a matter of law, because such claims are not cognizable in a § 1983 action and Plaintiff has failed to comply with West Virginia medical malpractice requirements; and

9) Plaintiff has failed to exhaust his administrative remedies.

## C. Defendants Johnson, Lee, Musilli, Sabatino, and Schmitt's ("Medical Defendants") Motion to Dismiss

The Medical Defendants contend that the amended complaint should be dismissed because

1) the complaint makes no allegations against Johnson, Schmitt, or Lee, other than to name them as parties;

2) Plaintiff fails to state an Eighth Amendment claim of deliberate indifference against any of the defendants; and

3) Plaintiff's medical malpractice claims fail, because he has not complied with the West Virginia Medical Professional Liability Act ("WVMPLA") and has not alleged the necessary elements of proof required by W.Va. Code § 55-7-B-3.

## D. Plaintiff's Response to Corrections Defendants' Motion to Dismiss

The plaintiff reiterates his arguments and attempts to refute the Corrections Defendants' on the same. He contends that he does not have adequate legal knowledge to bring his claims without the assistance of another inmate, and asserts that he no longer has copies of his original or amended complaint because they were "seized, destroyed or discarded by corrections staff" incident to his move. Finally, he admits that he is aware that none of his claims may be attributable to defendant Thornton and "avers that this Defendant might be suitable for removal as a defendant in this matter." ECF No. 54 at 11.

## E. Corrections Defendants' Reply to Plaintiff's Response

The Corrections Defendants reiterate their earlier arguments for dismissal, and contend that plaintiff's allegations regarding inadequate legal education are irrelevant to the claims in the amended complaint. They join with Plaintiff in urging Thornton's dismissal from this action,

reiterating that Plaintiff made no allegations against Thornton and in fact admits that Thornton is not a proper party to this suit.

## F. Defendant Strickland's Motion to Dismiss

Defendant Strickland contends that Plaintiff's amended complaint should be dismissed because

1) Plaintiff has failed to exhaust his administrative remedies against her;

2) Plaintiff's amended complaint does not allege sufficient facts to state claim of deliberate indifference against her under 42 U.S.C. § 1983;

3) any Fourteenth Amendment claim against Strickland should be dismissed, because her conduct was not deliberate or intended to deprive Plaintiff of a constitutional right;

4) Plaintiff has not demonstrated a serious medical need or a serious deprivation of a basic human need, thus he cannot maintain a § 1983 claim against Strickland;

5) Strickland cannot be held responsible for the negligence of others under *a respondeat superior* theory.

## G. Plaintiff's Response to Medical Defendants' Motion to Dismiss

Plaintiff reiterates his arguments and attempts to refute the Medical Defendants' on the same.

## H. Plaintiff's Response to Defendant Strickland's Motion to Dismiss

Again, plaintiff reiterates his arguments and attempts to refute defendant Strickland's on the same. Plaintiff denies Strickland's contention that he did not file a grievance regarding her actions.

## I. Defendant Strickland's Reply to Plaintiff's Response to her Motion to Dismiss

Defendant Strickland reiterates her arguments and attempts to refute Plaintiff's on the same.

## III. Standard of Review

## A. Motion to Dismiss

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses."

<u>Republican Party of N.C. v. Martin</u>, 980 F.2d 943, 952 (4th Cir.1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure §1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. <u>Mylan Labs, Inc. v. Matkari</u>, 7 F.3d 1130, 1134 (4th Cir. 1993); <u>see also</u> <u>Martin</u>, 980 F.2d at 952.

The Federal Rules of Civil Procedure "require[] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)). Courts long have cited the "rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [a] claim which would entitle him to relief." <u>Conley</u>, 355 U.S. at 45-46. In <u>Twombly</u>, the United States Supreme Court noted that a complaint need not assert "detailed factual allegations," but must contain more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." <u>Conley</u>, 550 U.S. at 555 (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," <u>Id.</u> (citations omitted), to one that is "plausible on its face," <u>Id.</u> at 570, rather than merely "conceivable." <u>Id.</u> Therefore, in order for a complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." <u>Bass v. E.I. DuPont de Nemours & Co.</u>, 324 F.3d 761, 765 (4th Cir. 2003) (citing <u>Dickson v. Microsoft Corp.</u>, 309 F.3d 193, 213 (4th Cir. 2002); <u>Iodice v. United States</u>, 289 F.3d 279, 281 (4th Cir. 2002)). In so doing, the complaint must meet a "plausibility" standard, instituted by the Supreme Court in <u>Ashcroft v. Iqbal</u>, where it held that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1949 (2009). Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully" in order to meet the plausibility standard and survive dismissal for failure to state a claim. <u>Id.</u>

Ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment. <u>Alternative Energy, Inc. v. St. Paul Fire and Marine Ins. Co.</u>, 267 F.3d 30 (1st Cir. 2001)(cited with approval in <u>Witthohn v. Federal Ins. Co</u>., 164 Fed. Appx. 395 (4th Cir. 2006) (unpublished)). There are, however, exceptions to the rule that a court may not consider any documents outside of the complaint. Specifically, a court may consider official public records, "documents incorporated into the complaint by reference, and matters of which the court may take judicial notice," or sources "whose accuracy cannot reasonably be questioned." <u>Katyle v. Penn Nat'l Gaming, Inc</u>., 637 F.3d 462 (4th Cir. 2011).

**B.  Motion for Summary Judgment**

Under the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

In <u>Celotex</u>, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues

of fact.  <u>Celotex</u> at 323.  Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." <u>Matsushita Electric Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  The nonmoving party must present specific facts showing the existence of a genuine issue for trial.  <u>Id.</u>  This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but  . . .  must set forth specific facts showing that there is a genuine issue for trial."  <u>Anderson</u> at  256.  The "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent the entry of summary judgment.  <u>Id.</u> at 248.  Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party."  <u>Matsushita</u>, at 587 (citation omitted).

## IV. <u>Analysis</u>

Title 42 U.S.C. §1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

Therefore, in order to state a claim under 42 U.S.C. §1983, the plaintiff must demonstrate that a person acting under color of state law deprived him of the rights guaranteed by the Constitution or federal laws.  <u>Rendall-Baker v. Kohn</u>, 547 U.S. 830, 838 (1982).

This Court is required to liberally construe *pro se* complaints. <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007); <u>see also</u> <u>Haines v. Kerner</u>, 404 U.S. 519, 520 (1972); <u>Gordon v. Leeke</u>, 574 F.2d 1147,

1151 (4th Cir. 1978). Such *pro se* complaints are held to a less stringent standard than those drafted by attorneys. Erickson, *supra* at 94; Gordon v. Leeke, *supra* at 1151, and a federal district court is charged with liberally construing a complaint filed by a *pro se* litigant to allow the development of a potentially meritorious case. Hughes v. Rowe, 449 U.S. 5, 9 (1980); Cruz v. Beto, 405 U.S. 319 (1972). When a federal court is evaluating a *pro se* complaint, the plaintiff's allegations are assumed to be true. Erickson, 551 U.S. at 93 (*citing* Twombly, 550 U.S. at 555-56). Nonetheless, the requirement of liberal construction does not mean that the court can ignore a clear failure in the pleading to allege facts which set forth a claim cognizable in a federal district court. See Weller v. Dep't. of Social Srvcs., 901 F.2d 387 (4th Cir. 1990); see also Ashcroft v. Iqbal, 556 U.S. 662 (2009)(outlining pleading requirements under Rule 8 of the Federal Rules of Civil Procedure for "all civil actions"). The mandated liberal construction afforded to *pro se* pleadings means that if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so; however, a district court may not rewrite a complaint to include claims that were never presented, Barnett v. Hargett, 174 F.3d 1128 (10th Cir. 1999), construct the plaintiff's legal arguments for him, Small v. Endicott, 998 F.2d 411 (7th Cir. 1993), or "conjure up questions never squarely presented" to the court, Beaudett v. City of Hampton, 775 F.2d 1274, 1278 (4th Cir. 1985). Finally, although Fed. R. Civ. P. 8(c) provides that "all pleadings shall be so construed as to do substantial justice," the Fourth Circuit further holds that a "heightened pleading standard" is highly appropriate in actions against government officials. Randall v. United States, 95 F.3d 339 (4th Cir. 1996). See also Dunbar Corp. v. Lindsey, 905 F.2d 754, 764 (4th Cir. 1990).

**A. Deliberate Indifference to Serious Medical Needs**

To state a claim under the Eighth Amendment for ineffective medical assistance, the plaintiff must show that the defendant acted with deliberate indifference to his serious medical needs. Estelle

v. Gamble, 429 U.S. 97, 104 (1976).  To succeed on an Eighth Amendment cruel and unusual punishment claim, a prisoner must prove: (1) that objectively the deprivation of a basic human need was "sufficiently serious," and (2) that subjectively the prison official acted with a "sufficiently culpable state of mind."  Wilson v. Seiter, 501 U.S. 294, 298 (1991).

A serious medical condition is one that has been diagnosed by a physician as mandating treatment or that is so obvious that even a lay person would recognize the need for a doctor's attention.  Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990), cert. denied, 500 U.S. 956 (1991).  A medical condition is also serious if a delay in treatment causes a life-long handicap or permanent loss.  Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3rd Cir. 1987), cert. denied, 486 U.S. 1006 (1988).

The following are examples of what does or does not constitute a serious injury. A rotator cuff injury is not a serious medical condition. Webb v. Prison Health Services, 1997 WL 298403 (D. Kansas 1997). A foot condition involving a fracture fragment, bone cyst and degenerative arthritis is not sufficiently serious. Veloz v. New York, 35 F.Supp.2d 305, 312 (S.D.N.Y. 1999). Conversely, a broken jaw is a serious medical condition. Brice v. Virginia Beach Correctional Center, 58 F. 3d 101 (4th Cir. 1995); a detached retina is a serious medical condition. Browning v. Snead, 886 F. Supp. 547 (S.D. W. Va. 1995). And, arthritis is a serious medical condition because the condition causes chronic pain and affects the prisoner's daily activities. Finley v. Trent, 955 F. Supp. 642 (N.D. W.Va. 1997). A pituitary tumor is a serious medical condition. Johnson v. Quinones, 145 F.3d 164 (4th Cir. 1998). A plate attached to the ankle, causing excruciating pain and difficulty walking and requiring surgery to correct it is a serious medical condition. Clinkscales v. Pamlico Correctional Facility Med. Dep't., 2000 U.S. App. LEXIS 29565 (4th Cir. 2000). A tooth cavity can be a serious medical condition, not because cavities are always painful or otherwise dangerous, but because a cavity that is

not treated will probably become so. <u>Harrison v. Barkley</u>, 219 F.3d 132, 137 (2nd Cir. 2000). A prisoner's unresolved dental condition, which caused him great pain, difficulty in eating, and deterioration of the health of his other teeth, was held to be sufficiently serious to meet the <u>Estelle</u> standard. <u>Chance v. Armstrong</u>, 143 F.3d 698, 702 - 703 (2nd Cir. 1998). A degenerative hip condition that caused a prisoner "great pain over an extended period of time and . . . difficulty walking" is a serious condition. <u>Hathaway v. Coughlin</u>, 37 F.3d 63, 67 (2nd Cir. 1994). Under the proper circumstances, a ventral hernia might be recognized as serious. <u>Webb v. Hamidullah</u>, 281 Fed. Appx. 159 (4th Cir. 2008). A twenty-two hour delay in providing treatment for inmate's broken arm was a serious medical need. <u>Loe v. Armistead</u>, 582 F.2d 1291, 1296 (4th Cir. 1978). A ten-month delay in providing prescribed medical shoes to treat severe and degenerative foot pain causing difficulty walking is a serious medical need. <u>Giambalvo v. Sommer</u>, 2012 WL 4471532 at *5 (S.D.N.Y. Sep. 19, 2012). Numerous courts have found objectively serious injury in cases involving injury to the hand, including broken bones. <u>See</u>, e.g., <u>Lepper v. Nguyen</u>, 368 F. App'x. 35, 39 (11th Cir. 2010); <u>Andrews v. Hanks</u>, 50 Fed. Appx. 766, 769 (7th Cir. 2002); <u>Bryan v. Endell</u>, 141 F.3d 1290, 1291 (8th Cir. 1998); <u>Beaman v. Unger</u>, 838 F.Supp. 2d 108, 110 (W.D. N.Y. 2011); <u>Thompson v. Shutt</u>, 2010 WL 4366107 at *4 (E.D. Cal. Oct. 27, 2010); <u>Mantigal v. Cate</u>, 2010 WL 3365735 at *6 (C.D. Cal. May 24, 2010) *report and recommendation adopted,* 2010 WL 3365383 (C.D. Cal. Aug. 24, 2010); <u>Johnson v. Adams</u>, 2010 WL 1407787 at *4 (E.D. Ark. Mar. 8, 2010) report and recommendation adopted, 2010 WL 1407790 (E.D. Ark. Mar. 31, 2010); <u>Bragg v. Tyler</u>, 2007 WL 2915098 at *5 (D.N.J. Oct. 4, 2007); <u>Vining v. Department of Correction</u>, 2013 U.S. Dist. LEXIS 136195 at *13 (S.D.N.Y. 2013)(chronic pain arising from serious hand injuries satisfies the objective prong of Eighth Amendment deliberate indifference analysis). A three-day delay in providing medical treatment for an inmate's broken hand was a serious medical need. <u>Cokely v.</u>

Townley, 1991 U.S. App. LEXIS 1931 (4th Cir. 1991); Hicks v. Janiszewski, 2014 U.S. Dist. LEXIS 83410; 2014 WL 2778731 (N.D. W.Va. June 19, 2014)(Deliberate indifference found after an initial x-ray confirmed inmate's fractured hand but a one-month delay in providing any treatment for the same ensued, necessitating re-breaking the by-then-improperly-healed bone and setting it with pins, and then failing to timely return plaintiff to orthopedist for follow up removal of pins.).

The subjective component of a cruel and unusual punishment claim is satisfied by showing that the prison official acted with deliberate indifference. Wilson, 501 U.S. at 303. A finding of deliberate indifference requires more than a showing of negligence. Farmer v. Brennan, 511 U.S. 825, 835 (1994). A prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. A prison official is not liable if he "knew the underlying facts but believed (albeit unsoundly) that the risk to which the fact gave rise was insubstantial of nonexistent." Id. at 844.

"To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment, [or lack thereof], must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d at 851. A mere disagreement between the inmate and the prison's medical staff as to the inmate's diagnosis or course of treatment does not support a claim of cruel and unusual punishment unless exceptional circumstances exist. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). A constitutional violation is established when "government officials show deliberate indifference to those medical needs which have been diagnosed as mandating treatment, conditions which obviously require medical attention, conditions which significantly affect an individual's daily life activities, or conditions which cause pain, discomfort or a threat to good health." See Morales Feliciano v.

Calderon Serra, 300 F.Supp.2d 321, 341 (D.P.R. 2004) (citing Brock v. Wright, 315 F.3d 158, 162 (2nd Cir. 2003)).

In addition, the test for deliberate indifference "affords considerable latitude to prison medical authorities in the diagnosis and treatment of the medical problems of inmate patients. Courts will disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . [as it] remains a question of sound professional judgment. Bowring v. Godwill, 551 F.2d 44, 48 (4th Cir. 1977).

## 1) Defendants Hill, Pszcolkowski, Rubenstein, Thornton, "The Corrections Defendants"

In his amended complaint, Plaintiff names defendant Hill in her capacity as Associate Warden of Operations; defendant Pszcolkowski in her capacity as Warden; Rubenstein in his capacity as Commissioner of the West Virginia Division of Corrections; and Joseph Thornton as Cabinet Secretary of the Department of Military Affairs and Public Safety [sic]. However, as the Corrections Defendants correctly pointed out, Plaintiff's amended complaint does not allege that any of these Corrections Defendants were personally involved in the violation of his constitutional rights. Instead, Plaintiff appears to name them only in their official capacity.

In his response to the Corrections Defendants' dispositive motion noting this, Plaintiff alleges that Hill, after being contacted by "outside parties" regarding his dietary issues, met with and advised him that she would look into the matter, but never did so until he had a reaction due to his "allergies [sic]." ECF No. 54 at 4. He further alleges that Pszczolkowki and "the offices of . . . Jim Rubenstein" were repeatedly notified by the same "outside party" (Amanda Udell ("Udell"), Plaintiff's "close friend" and the mother of his child) of his medical and dietary issues. Id. at 8. Plaintiff alleges that Pszczolkowki was deliberately indifferent to his serious medical needs because she was repeatedly notified of his condition via communications and grievances, Udell's phone calls, and through

communications with other correctional staff. Id. at 8 - 9. He contends that Rubenstein was likewise deliberately indifferent because he was repeatedly made "fully aware" that plaintiff was being denied proper food to remedy the dietary allergy issues, via plaintiff's own communications and grievances and Udell's phone calls to his office. Id. at 9.

As an initial point, the undersigned notes that the Fourth Circuit has held that non-medical personal may rely on the opinion of medical staff regarding the proper treatment of inmates. Miltier v. Beorn, 896 F.2d 848 (4th Cir. 1990). Thus, the Corrections Defendants were entitled to reply on the opinion of medical staff as to whether the plaintiff needed additional medical care and/or testing. Further, to the extent that the plaintiff may be asserting that the Corrections Defendants were deliberately indifferent to his needs by denying his administrative grievances, that claim is without merit because that is not the type of personal involvement required to state a claim. See Paige v. Kuprec, 2003 W.L. 23274357 *1 (D. Md. March 31, 2003).

There is no *respondeat superior* liability under § 1983. See Monnell v. Department of Social Services, 436 U.S. 658 (1978); see also Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1997). Instead, "liability will lie where it is affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights." Vinnedge, *supra*. Nonetheless, when a supervisor is not personally involved in the alleged wrongdoing, he may be liable under § 1983 if a subordinate acts pursuant to an official policy or custom for which he is responsible. Fisher v. Washington Metropolitan Area Transit Authority, 690 F.2d 1113 (4th Cir. 1982). Similarly, a supervisor may be liable under § 1983 if the following elements are established: "(1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a 'pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of

the alleged offensive practices,' and (3) there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." <u>Shaw v. Stroud</u>, 13 F.3d 791, 799 (4th Cir.), cert. denied, 513 U.S. 813 (1994). "Establishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm or constitutional injury." <u>Shaw</u>, 13 F.3d at 799. "A plaintiff may establish deliberate indifference by demonstrating a supervisor's 'continued inaction in the face of documented widespread abuses.'" <u>Id.</u>

Accordingly, because Plaintiff concedes and the Corrections Defendants concur in recommending that Thornton should be dismissed from this action because there are no allegations in the amended complaint against him, the undersigned recommends his dismissal from this action. Further, because Plaintiff fails to allege any personal involvement on the part of any the remaining Corrections Defendants, and does not make any allegation which reveals the presence of the required elements for supervisory liability, Plaintiff fails to state a claim of deliberate indifference against them, and thus, they should be dismissed as defendants in this action as well.

**2) <u>Defendants Johnson, Lee, Musilli, Sabatino, and Schmitt, "The Medical Defendants"</u>**

To the extent that any part of the chronology of events in this section have been misstated, the undersigned has attempted to glean from Plaintiff's rambling, disorganized, and often contradictory pleadings a logical chronological recitation of the facts. Plaintiff's Amended Complaint often fails to identify when, where and who committed what acts and Plaintiff did not allege his claims with specificity until he filed the first of his three responses to the Defendants' dispositive motions. <u>See</u> ECF No. 27 and ECF No. 54. Accordingly, the facts recited here have been cobbled together from a careful scrutiny of these two documents.

Plaintiff alleges that beginning on July 6, 2012, when he was first incarcerated, he was housed at the North Central Regional Jail ("NCRJ") [ECF No. 68 at 7], and that "almost" every time he ate institutional food, he became ill [id. at 8], suffering vomiting, watery diarrhea, fatigue, abdominal pain, weakness, light-headedness. Id. at 15. He alleges that another inmate advised him that he probably had a soy allergy. Id. He inquired about this possibility at sick call and was advised by a PrimeCare nurse that there was no such thing as a soy allergy. Id. He avers that he lost weight and his institutional record would reflect that. Id. at 8. Udell made several attempts to intervene on his behalf by contacting administration and the WVDOC offices. ECF No. 54 at 2. While still trying to resolve his dietary issues, he was transferred to Martinsburg Correctional Center ("MCC") on an unspecified date. Id. Upon arrival at MCC, he notified staff and medical personnel of his dietary issues but no action was taken. Id.

Plaintiff remained at MCC until he was transferred to Mt. Olive Correctional Center ("MOCC") on April 22, 2014. ECF No. 54 at 2. Upon arrival at MOCC, he informed the MOCC staff and Wexford Health Sources, Inc. ("Wexford") medical staff of his dietary and medical issues. He contends that after evaluating him, the Wexford personnel noted a soy allergy in his medical records and he was placed on a "no soy" diet. Id. at 3. He remained on that diet until he was transferred to Huttonsville Correctional Center ("HCC") on October 3, 2014.

Upon arrival at HCC, Plaintiff informed staff of his dietary/medical issues and was told that MOCC and Wexford staff had documented his soy allergy on his transfer order. Id. HCC staff told him he would be issued a "diet card" permitting him to receive the meals appropriate for his dietary/medical needs, but after twelve days and "hardly eating" he went to medical to get his diet card issued, and was told that his allergies were "[i]nassessable [sic]" and therefore, no diet card was issued and HCC staff did nothing to assist him. Id. Plaintiff contends that for the next eight months

(October 3, 2014 – June 5, 2015), he survived by picking what portions from his meals he could eat and lost "a great deal of weight" even though his "loved ones" sent money for him to buy food from commissary. Id. Udell again tried to intervene on his behalf by contacting HCC administration and the WVDOC Commissioner. Id.

On June 5, 2015, Plaintiff was transferred to the NCF. ECF No. 68 at 9. He avers that his health record documenting his "soy allergy" would have been transferred along with him, proving to the Wexford and NCF staff that he should have a special diet. However, despite this, he still did not receive his "diet or substitute upon arrival at NCF." Id. He contends that he lost at least 15 pounds while incarcerated at NCF because he has weighed 165 pounds since age fourteen and "upon being released from segregation at NCF on 11-2-15 . . . [he] only weighed 150.6 pounds." Id. at 11. After consuming a product containing soy on an unspecified date, and vomiting afterwards, Plaintiff was assisted by "Allison," a Wexford nurse. She then provided him with a "no soy" diet order and he received this diet for a few weeks. Id. However, the diet was later "pulled" for no apparent reason; he filed a "sick call" and submitted a letter to Medical, asking to have it resumed. He was seen by Nurse Practitioner ("NP") Kristie Mauser on or about July 11, 2015; she advised him that it was the kitchen or Aramark employees' fault that his special diet was taken from him and that she would resubmit the diet order and "the letter to Aramark." ECF No. 68 at 9. Plaintiff began receiving the diet again, but after an unspecified time, the diet was again "pulled." Plaintiff filed for another sick call and had to wait 30 days to be seen; in the interim, he was forced to eat food containing soy or go hungry. Id. Finally, on September 15, 2015, he was seen by "NP Kristie" at NCF, who informed him that no-soy diet being pulled was error, and that it was Aramark Supervisor Kelly Strickland who pulled the diet "because almost 70 percent of the processed foods contained soy." Id. at 10. Plaintiff objected, questioning how an Aramark employee who was not medically licensed had the authority

to pull an order for a special diet with an indefinite end date. Id. NP Kristie advised him that the matter would be corrected, and Plaintiff began receiving his soy-free diet for almost a month, until "new diet cooks" took over. Id. At that time, he began receiving "cardiac" trays, instead of the no-soy tray (no processed foods); he contends that the cardiac diet was the same diet that general population inmates received, containing many soy-based foods, but with fruit substituted for the dessert. Id. Plaintiff contends that he complained about the "cardiac" diet to staff, to no avail. ECF No. 54 at 5. He attempted to send these incorrect trays back but was repeatedly refused; he began keeping a log to record when he was denied a soy-free diet and the GI symptoms he experienced as a result. ECF No. 68 at 10. Further, while this diet order was in place, he could not order commissary foods to supplement his diet. Id.

Plainitff continued to experience digestive issues and rashes [id.] until finally, on October 24, 2015, he had a "severe reaction" and was rushed to medical, where he avers a nurse advised him that he "most likely suffered from anaphylactic shock" from his food allergies. ECF No. 54 at 5. Plaintiff describes this episode as

> possible Anaphylactic Shock due to consuming food that either was in fact soy-laden or that was cross-contaminated by being cooked in the same food [sic] as General Population. As a result of the Shock [sic] . . . [he suffered] [e]xtreme chest pain, hard, labored breathing, twitching of left side of face . . . and left calf muscle, shooting/stabbing pain in right arm . . . systoic [sic] blood pressure 140 – 150 or so and Pulse . . . [of] 180 bpm. It was so serious that Plaintiff was almost admitted to an outside hospital.

ECF No. 68 at 15.

On October 29, 2015, Plaintiff again received a tray with food containing soy and informed staff, but received no substitute and therefore, had no lunch. ECF No. 68 at 11. He avers that he told staff that he refused to eat any more processed food for fear of having an allergic reaction and dying; "[m]agically" the kitchen found his diet order and started providing "no soy" diet again. Id. After

this episode, Plaintiff was placed on a "renal diet" until he was transferred back to MOCC on February 8, 2016. See Id. and ECF No. 54-1 at 3 and 9.

On November 10, 2015, plaintiff filed a grievance, requesting to have "a health screening done on me by an outside competent physician due to my allergy and all that has occurred. I have been told this isn't possible. This is denial of adequate medical treatment." ECF No. 27-10 at 2. In response, he was advised that he would be placed on the nurse practitioner/doctor call list to be evaluated for an outside appointment. The grievance was denied on November 20, 2015, because "[c]linical decisions are the sole province of the responsible health care practitioner and are not countermanded by non-clinicians." Id. On November 25, 2015, Plaintiff filed another grievance, seeking to be transferred to SMCC's special needs unit or its medical unit. ECF No. 27-11 at 2. Plaintiff was transferred out of NCF and back to MOCC on February 8, 2016. ECF 54-1 at 3 and 9. Plaintiff avers that once he arrived back at MOCC, he was informed by staff there that they would "not honor the Renal diet" and he was "again placed back on the necessary NO SOY diet. ECF No. 54 at 5.

Plaintiff contends that since his "possible Anaphylactic Shock [sic]," he has been denied screening by an outside physician and his vital signs have only been checked once, during a sick call [ECF No. 68 at 11]; he has been denied any medication to treat the violent vomiting that occurred within 20 minutes of his consuming soy [id. at 15]; and that NCF "does not provide adequate medical treatment" because NCF and Wexford make prisoners wait 3-4 weeks to be seen after they file for "sick call," instead of the required 24-72-hour wait. Id. at 11.

Faced with the choice of either eating soy or nothing at all, Plaintiff contends he suffered vomiting; debilitating diarrhea; abdominal pain; extreme weight loss; fatigue; weakness; and

lightheadedness on "almost a daily basis especially" between October 11 - 15, 2015, "not including all that I have been subjected to and denied for around the past 400 days." Id. at 15.

Attached to Plaintiff's first response to the Corrections Defendants' dispositive motion is copy of a WVDOC grievance that Plaintiff filed on February 18, 2016, ten days after he was transferred from NCF to MOCC, requesting a "renal styro diet order." ECF No. 54-1 at 3.  In that grievance, Plaintiff contended that

> . . . [u]pon entering into this facility, I stated that NCF had given me a RENAL diet order as my most current diet order.  That yes before I was on "NO-SOY" Diet [sic]. I was told this could not be confirmed due to the fact that NCF did not send my RENAL diet order here. I have a copy of my RENAL diet order in my cell from NCF and also when I was in medical getting a physical on 2-16-16 I mentioned the renal diet to the nurse.  She looked in the Physican's [sic] Notes on 12-11-15 and seen where [sic] the Doctor wrote he was starting me on a RENAL diet.  I have not been given my RENAL DIET ORDER YET. The RENAL was the most recent (current) prior to entering the facility. The diet was started on 12-11-15 . . . I am not going to be forced into a vegitarian [sic] diet, that is in fact made in the "NON FLESH" area that cooks pure soy foods.  The cross contamination can be leathal [sic] to me and . . . the RENAL diet I have had NO PROBLEMS WITH.  I have to have a RENAL STYRO [diet] because I cannot always eat right that minute due to how my body has been effected [sic] from NCF's deliberate indifference[.]

Id. at 4.

Also attached to Plaintiff's first response to the Corrections Defendants' dispositive motion is copy of a WVDOC grievance that Plaintiff filed on March 4, 2016, almost a month after his transfer out of NCF.  Id. at 5. The March 11, 2016 response by Donna Warden, RN HSA states

> [y]ou have been ordered NO SOY diet **due to your documented soy allergy**.  The response provided you that Aramark has been sent notification of your allergy is accurate.  If you are ill, then submit a Health Service Request to be seen by Medical, you can then discuss the medical necessity for having a renal diet.  Your records do not provide evidence of need for renal precaution as you have indicated.

Id. (emphasis added).

The Eighth Amendment imposes a duty upon prison officials to provide inmates humane conditions of confinement and to ensure that inmates receive, inter alia, "adequate food." Farmer v.

Brennan, 511 U.S. at 832; see also Laufgas v. Speciale, 263 F. App'x 192, 198 (3rd Cir. 2008) ("[P]risoners are guaranteed a nutritionally adequate diet under the Eighth Amendment.") (citing Ramos v. Lamm, 639 F.2d 559, 571 (10th Cir. 1980)("This includes providing nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and wellbeing of the inmates who consume it.")); accord Robles v. Coughlin, 725 F.2d 12, 15 (2nd Cir. 1983); Jackson v. Gordon, 145 Fed. App'x 774, 776 (3rd Cir. 2005) (inmate stated an Eighth Amendment claim when he alleged that prison officials knew he was severely lactose-intolerant and allergic to eggs, but denied him a therapeutic diet). As long as a sufficient diet is provided, prison food does not rise to the level of Eighth Amendment violation. Freeman v. Trudell, 497 F. Supp. 481, 482 (E.D. Mich. 1980); Lovern v. Cox, 374 F. Supp. 32, 35 (W.D. Va. 1974). And regarding prison diets generally, the Seventh Circuit has determined that a well-balanced diet that contains adequate nutritional value, despite being cold or poorly-prepared, does not violate the constitution. Lunsford v. Bennett, 17 F.3d 1574, 1580 (7th Cir. 1994) (quoting Smith v. Sullivan, 553 F.2d 373, 380 (5th Cir. 1977)).

The Fourth Circuit Court of Appeals has held that an occasional lapse in a prisoner's diet does not rise to the level of an Eighth Amendment violation. Love v. Walker, 1991 U.S. App. LEXIS 13413 *3 (4th Cir. June 28, 1991). However, "in some circumstances an inmate's claim that he was denied food may satisfy the first Farmer prong." Reed v. McBride, 178 F.3d 849, 853 (7th Cir. 1999). A court must assess the amount and duration of the deprivation to make this determination. Id. A "few withheld meals would not contravene the constitution. Id. The denial of such a basic human need as food has been found to rise to – or fall short of -- the level of a constitutional violation, depending on the severity of the food deprivation. Id., citing Simmons v. Cook, 154 F.3d 805, 809 (8th Cir. 1998) (denying prisoners four consecutive meals over two days

met objective prong of deliberate indifference test); Talib v. Gilley, 138 F.3d 211, 214 n.3 (5th Cir. 1998) (denial of one out of every nine meals was not a constitutional violation).

Courts reviewing cases by prisoners challenging the soy content of the diets they received while in custody have not concluded that soy-based diets pose a serious risk to the health of prisoners absent an allergy or another condition for which soy is contraindicated. "Given the absence of precedent finding that it is unconstitutional to provide inmates with a soy-based diet *if soy is not medically contraindicated,* no defendant would be on notice that providing such a diet violates an inmates rights." Riley-El v. Godinez, 2015 U.S. Dist. LEXIS 98567 * 13 - 14 (N.D. Ill. July 27, 2015) (emphasis added).

In Harris v. Brown, No. 07 CV 3225, 2014 U.S. Dist. LEXIS 137870 at * 12-13 (C.D. Ill. Sept. 30, 2014) (Baker, J.), a group of prisoners alleged that their soy-laden diet endangered their health. The court held that a risk only violates the Eighth Amendment if it is "one that 'society considers . . . so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk.'" Id. (quoting Helling v. McKinney, 509 U.S. 25, 36, 113 S.Ct. 2475, 125 L. Ed. 2d 22 (1993)). The Harris court noted the pervasiveness of soy in the American diet, and the fact that the government permits food manufacturers to tout soy's benefits on food labels, before deciding that "society today simply does not see soy protein as a risk to the general population, much less a serious risk." Harris at *13-14. It then granted the defendants' motion for summary judgment, explaining that even if it accepted the opinions of the plaintiffs' experts, the most that could be said was that the "safety of soy is a topic of current debate and study," which is not enough to establish an Eighth Amendment violation. Id. at *12; see also Martin v. Scott, 156 F.3d 578, 580 (5th Cir. 1998) (per curiam) (holding that prisoner's claim that he was

subjected to cruel and unusual punishment because he became ill after consuming a soy-based meat substitute "simply does not rise to the level of cruel and unusual punishment"); <u>Adams v. Talbor</u>, No. 13-2221-JES-JAG, 2013 U.S. Dist. LEXIS 158632 at *5-7 (C.D. Ill. Nov. 6, 2013) (Shadid, J.) (dismissing prisoner's claim that soy-based diet caused him to experience stomach problems); <u>Smith v. Rector</u>, No. 13-cv-837-GPM, 2013 U.S. Dist. LEXIS 140359 at *10-11 (S.D. Ill. Sept. 30, 2013) (Murphy, J.) (dismissing claim based on "vague allegations" that prison meals contained too much soy); <u>Hong v. McNeil</u>, No. 4:10cv155-SPM/WCS, 2012 U.S. Dist. LEXIS 19325 at *15-16 (N.D. Fla. Jan. 6, 2012) (recommending the grant of summary judgment to prison officials, because the record contained no evidence that soy products caused harm, much less that prison officials were indifferent to any risk of harm); <u>Mitchell v. New York State Dep't of Corr. Servs.</u>, No. 6:06-CV-6278 (MAT), 2012 U.S. Dist. LEXIS 176209 at *35-36 (W.D.N.Y. Dec. 12, 2012) (dismissing as frivolous prisoner's claim that a soy-based diet causes cancer); <u>Owens v. Shah</u>, 2016 U.S. Dist. LEXIS 107622 (S.D. Ill. July 12, 2016) *report and recommendation adopted by* <u>Owens v. Shah</u>, 2016 U.S. Dist. LEXIS 107624 (S.D. Ill. Aug. 15, 2016) (The personal opinion of the plaintiff, who had not been medically diagnosed with a soy allergy or food sensitivity, regarding the impact of soy on his health was based on suspicion and hearsay and was not entitled to weight).

The Fifth Circuit found an inmate's Eighth Amendment claim frivolous when he alleged that he became ill after being fed a soy-based meat substitute. See <u>Martin v. Scott</u>, 156 F.3d 578 (5th Cir. 1998). More recently, a Florida District Court held that prison officials did not violate the Eighth Amendment rights of an inmate who experienced GI illness after eating soy-based

foods. <u>Floyd v. McNeil</u>, No. 4:10-cv-289-RH/WCS, 2011 WL 6955839 (N.D. Fla. December 5, 2011).

The burden of demonstrating deliberate indifference to a serious medical need is very high. The Eighth Amendment protects prisoners from inhumane conditions of confinement. <u>Williams v. Benjamin</u>, 77 F.3d 756, 761 (4th Cir.). However, extreme deprivations are required, and only those deprivations that deny the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. <u>Hudson v. McMillian</u>, 503 U.S. 1, 9, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992). Not only must a plaintiff allege sufficient fact to show that prison officials knew of and disregarded a substantial risk of serious harm, a plaintiff must also allege "a serious or significant physical or emotional injury resulting from the challenged conditions." <u>Strickler v. Waters</u>, 989 F.2d 1375, 1381 (4th Cir. 1993).

For example, in <u>Sosebee v. Murphy,</u> 797 F.2d 182-83 (4th Cir. 1986); the Fourth Circuit found that if prison guards were aware that a steak bone had pierced an inmate's esophagus, causing infection that resulted in the inmate's death, and intentionally abstained from seeking medical help, such conduct *might* establish deliberate indifference to a serious medical need. And in <u>Webster v. Jones</u>, 554 F.2d 1285 (4th Cir. 1977), the plaintiff, who had complained numerous times of eye problems and loss of vision, claimed that he was cursorily examined after his initial complaint, but never re-examined despite later complaints. The doctor claimed that he examined Webster several times, but never diagnosed a medical problem with his eye. <u>Id.</u> at 1286. Subsequently, a specialist found that Webster's vision had deteriorated to 20/400 and that he suffered from a detached retina and iritis, and that his vision could not be restored. <u>Id.</u> The Fourth Circuit found that, even if the doctor had been negligent in failing to properly diagnose or

treat Webster, negligence is not sufficient to demonstrate deliberate indifference to a serious medical need and, thus, Webster's allegations did not constitute a cognizable constitutional claim. See also Johnson v. Quinones, 145 F.3d 164, 168 (4th Cir. 1998).

Here, then, Plaintiff's claims appear to be that between the dates of June 5, 2015 and February 8, 2016 (when he was transferred back to MOCC), NCF and its Wexford medical staff denied him a consistent soy-free diet for his alleged soy allergy and failed to adequately treat him when he experienced untoward medical symptoms as a result. Plaintiff also appears to allege that from July 6, 2012 until June 5, 2015, and from February 8, 2016 until at least May 6, 2016, the staff/medical staff at the NCRJ, MCC, and/or MOCC were deliberately indifferent to his serious medical needs. However, because the staff at the NCRJ, MCC, and MOCC are not named defendants herein, those claims will not be given review.

Plaintiff first alleges that when he arrived at NCF on June 5, 2015, his health record documenting his "soy allergy" should have arrived with him, apprising Wexford/NCF staff of his need for a soy-free diet, but despite that, he did not receive the diet on arrival. ECF No. 68 at 9. Plaintiff's claim that he was placed on a 'no soy' diet at MOCC contradicts his claim elsewhere that once he finally arrived at MOCC and began working in the kitchen there, he was able to read labels and avoid processed foods containing soy, his health began to improve and he gained weight [ECF No. 68 at 8] and the October 15, 2014 Wexford Interdisciplinary Progress Note that reports that Plaintiff "[w]orked in the kitchen at MOCC so he didn't need a diet card [while there] according to the medical personal [sic][.]" ECF No. 27-4 at 2. Because the evidence in the record does not support Plaintiff's claim that NCF failed to keep him on the no-soy diet he was

already on before he arrived there, the Medical Defendants cannot be found to have been deliberately indifferent.

Next, Plaintiff alleges that on an unspecified date (sometime between his arrival at NCF and July 11, 2015), after he ate something containing soy and vomited, a Wexford nurse named Allison came to his aid. She provided him with a "no soy" diet order, and he received this diet for a few weeks [ECF No. 68 at 9]; the soy-free diet was later "pulled" for no apparent reason; he filed a "sick call" and submitted a letter to Medical, asking to have the diet order resumed; and was seen by NP Kristie Mauser on or about July 11, 2015. Mauser advised him that it was the kitchen or Aramark employees' fault that his special diet was taken from him and that she would resubmit the diet order and "the letter to Aramark." Id. Attached to the Amended Complaint is a July 11, 2015 "Aramark Medical Diet Order form" indicating that Plaintiff received a "no soy" diet order that day, to continue indefinitely. ECF No. 27-7 at 2.

Plaintiff admits that he began receiving the diet again, but after an unspecified time, the diet was again "pulled;" he filed another sick call and had to wait 30 days to be seen; during that time he was forced to eat food containing soy or go hungry. ECF No. 68 at 9. Attached to the Amended Complaint is an August 25, 2015 grievance, seeking "diet tray back so that I'm not being denied food [ECF No. 27-1 at 2] and asserting that tray had been taken without explanation and that he could not eat processed patties because they made him vomit "most of the time" and "always" gave him diarrhea. Id. at 3. In response, on August 27, 2015, he was told that "[a]ll dietary changes need to be evaluated by NP or MD & require you to put in a sick call slip." Id. at 2. Plaintiff appealed the grievance's denial to the Warden; on September 8, 2015, the denial was affirmed and Plaintiff was advised that "Policy Directive 40.01 – Clinical decisions

are the sole province of the responsible health care practitioners and are not countermanded by non-clinicians." Id. Plaintiff contends that on September 15, 2015, "NP Kristie" informed him that the "pulling" of the no-soy diet was error, and that it was Aramark Supervisor Kelly Strickland who pulled the diet "because almost 70 percent of the processed foods contained soy." ECF No. 68 at 10. Plaintiff objected, questioning how a non-medical Aramark employee had the authority to pull an order for a special diet with an indefinite end date. Id. NP Kristie advised him that the matter would be corrected, and Plaintiff began receiving his soy-free diet for almost a month. Id. Attached to Plaintiff's Amended Complaint is a September 15, 2015 "Medical Diet Order" by Aramark Correctional Services, starting him on a no-soy – allergy diet. ECF 27-6 at 2.

One month later, Plaintiff contends that after "new diet cooks" took over, he began receiving "cardiac" trays instead of the no-soy tray (no processed foods). He alleges that these trays were the same diet that general population inmates received, full of soy-based foods, but with fruit substituted for the dessert. Id. Plaintiff contends that he complained about the diet to no avail. ECF No. 54 at 5. He alleges that he attempted to send these trays back but was repeatedly refused, so he began keeping a record of the symptoms he experienced when he had to eat soy. ECF No. 68 at 10. While on the "cardiac" diet, he contends he was not allowed to order any commissary foods to supplement his diet. Id. Attached to Plaintiff's Amended Complaint is a copy of an October 11, 2015 grievance, seeking "no processed food diet tray;" contending that the no-soy diet was not being followed; and that he was again having vomiting and diarrhea. ECF No. 27 at 2. In the grievance, Plaintiff explained that prior to the "new diet cooks" starting, he was given a "renal" tray and did not experience vomiting or diarrhea; he

asked that if he could not have a no-soy tray, he be given a "renal" or "no processed food" tray. Id. at 3. In response, on October 13, 2015, he was told "I am unable to change or alter your diet. I will place you on to see the doctor that comes in on Thursdays so you can discuss this issue with him." Id. at 2. "Thursday" of that week would have been October 15, 2015. Plaintiff's Amended Complaint sheds no light on whether he was seen by a physician on that date or whether his no-soy diet was resumed; it simply does not address the issue.

However, Plaintiff avers that he continued to experience digestive issues and "rashes" [id.] until finally, on October 24, 2015, he had a "severe reaction" and was rushed to medical, where he avers a nurse advised him that he "most likely suffered from anaphylactic shock resulting from his food allergies." ECF No. 54 at 5. (In Plaintiff's attached "SICKNESS LOG," he contends that "PA Christy" is the person who told him he could have experienced anaphylactic shock. ECF No. 17-8 at 5). Although his Amended Complaint does not specifically say whether his no-soy diet trays were resumed after this incident, in his "SICKNESS LOG," Plaintiff contends that "PA Christy" told him on October 25, 2015, that Aramark wasn't following his diet correctly; showed him a letter she sent to the Aramark supervisor and his diet order; and told him that the "kitchen has been screwing up a lot of people's diets." ECF No. 27-8 at 5. Further, he avers she told him that his tray should be "like a renal tray," in that it should contain no processed foods. Id. Upon being released from medical that day, Plaintiff contends that his very first tray contained processed meat; he attempted to send it back to the kitchen, but the C.O. called medical and "Nurse Sabatino supposedly" told the CO that Plaintiff "can have processed meats and patties, just no soy." Id. Plaintiff contends that all "processed meats" contain soy, so he did not eat the tray but went to bed hungry.

Plaintiff contends that on October 29, 2015, he again received food containing soy and informed staff, but received no substitute and therefore, had no lunch. ECF No. 68 at 11. He avers that he told staff that he refused to eat any more processed food for fear of having an allergic reaction and dying; "[m]agically" the kitchen found his diet order and started providing "no soy" diet again. Id. After this episode, Plaintiff contends that he was placed on a "renal diet" until he was transferred back to MOCC on February 8, 2016. See Id. and ECF No. 54-1 at 3 and 9.

As an initial point, Plaintiff's allegation that "another inmate" told him he probably had a soy allergy is hardly a credible medical diagnosis of soy allergy; it is unlikely that that inmate had a medical degree, let alone a subspecialty in allergy and immunology. Plaintiff impliedly admits that he was never medically diagnosed with a soy allergy [see ECF No. 68 at 8], despite his later claim in a February 18, 2016 grievance at MOCC that "the Doctor wrote he was starting me on a RENAL diet." ECF No. 65 at 5. This statement conflicts with Plaintiff's statement elsewhere in the record, that after his "anaphylactic shock," he told "Counselor Coast" that he would no longer eat any more soy foods; Coast "relayed that information to other [sic], and had discussions with *some unknown parties*, after which the Plaintiff was placed on a "Renal Diet." ECF No. 65 at 5 (emphasis added). Nonetheless, even without an actual medical diagnosis, it is apparent from the record that the NCF staff and Wexford medical staff were willing to accommodate Plaintiff's self-diagnosed claims of soy allergy anyway, given that the responses to the grievances Plaintiff attached to his amended complaint indicate the "allergy" was documented in Plaintiff's records and the NCF/Wexford staff repeatedly attempted to provide various diets to accommodate his needs, each time the diet was "pulled."

Therefore, because Plaintiff's "allergy" was self-diagnosed, the record before me does not show that Plaintiff had a serious medical need. See, e.g. Gaudreault, 923 F.2d at 208 (A serious medical condition is one that has been diagnosed by a physician as mandating treatment[.]). Accordingly, Plaintiff cannot meet the first prong of proving his Eighth Amendment claim. However, liberally construing Plaintiff's *pro se* pleadings, viewing the facts pled in them as true and considering them in the light most favorable to him, as required, given that while Plaintiff was incarcerated, he only had access to allergy testing if the Medical Defendants provided it, had he actually *had* a soy allergy, because an actual soy allergy *could be* a sufficiently serious medical need if it resulted in a true anaphylactic shock, he may have been able to prove the objective prong necessary to prove an Eighth Amendment claim of deliberate indifference. Wilson, 501 U.S. at 298; see also Scarbro v. New Hanover County, 274 Fed. Appx. 366, 371 (4th Cir. 2010) (injury from a head-first fall onto concrete was an objectively serious medical need; autopsy afterward showed an acute subdural hematoma and neck fracture). Nonetheless, the point is moot; Plaintiff has not been so diagnosed, and even if he had, he would still be unable to prove deliberate indifference, because he cannot meet his burden to prove the second, subjective prong of an Eighth Amendment analysis.

The record as a whole disputes Plaintiff's claim that the Medical Defendants were ever both aware of his alleged allergy and deliberately disregarded a substantial risk of serious harm to him by denying him a soy-free diet or proper medical care for the symptoms of soy allergy. To the contrary, it is apparent from the medical records and attached administrative remedies and their responses that Plaintiff was seen repeatedly and counseled by medical for his complaints regarding his diet trays and his symptoms; advised to come back to medical to discuss the need

for his diet order to be adjusted; his diet was repeatedly re-ordered whenever it was interrupted for whatever reason, whether through error or inadvertence by the kitchen, the inmates working there, or Aramark. Indeed, Defendant Strickland's reply to Plaintiff's response to her dispositive motion notes that Plaintiff's response to her dispositive motion clarifies his earlier claim that she "pulled" his no-soy diet for "no reason," by admitting it occurred after he was "placed in segregation on an unrelated matter [ECF No. 72 n.1 at 3 and ECF No 65 at 4];" she points out that Plaintiff's transfer to segregation "in and of itself, could explain the error with Plaintiff's diet tray." ECF No. 72 n.1 at 3. Further, Plaintiff was provided medical care when ill, although admittedly, not always the exact type of medical care he believed he was entitled to have. Plaintiff was kept in 24-hour medical observation after his October 24, 2015 reaction. Despite Plaintiff's claim that medical at NCF was deliberately indifferent by making inmates wait 30 days to be seen [ECF No. 68 at 9], the October 13, 2015 response to his October 11, 2015 grievance over the interruption of his no-soy diet indicated that he was scheduled to see the doctor on October 15, 2015, a wait of only 4 days from the date of his grievance. See ECF No. 27 at 2.

While Plaintiff avers that after vomiting an entire meal, the Defendants would not provide him with anything else to eat and that he lost 15 pounds while at NCF [ECF No. 68 at 11];" there is nothing in the record to show what Plaintiff's weight was on June 5, 2015, when he arrived at NCF. There are, however, two pages of MOCC medical records attached to the amended complaint, showing Plaintiff weighed 178 pounds on October 3, 2014, [ECF No. 27-3 at 2; see also ECF No. 27-4 at 2] and that 12 days later, on October 15, 2014, he had lost 8 pounds and was down to 170 pounds. Because Plaintiff did not arrive at NCF until June 5, 2015,

any weight loss that occurred prior to that date is moot here, because Plaintiff did not name MOCC's staff/medical staff as defendants herein. Even so, while Plaintiff may have missed some meals at times, either because he refused them because he thought they contained soy, or because he ate them and vomited, he does not allege that he went without *any* food at all for consecutive meals on consecutive days. See Reed, 178 F.3d at 853 (A few withheld meals do not contravene the constitution.). Plaintiff admits that he was able to pick portions of meals from his trays and eat what he could. See ECF No. 65 at 4. The fact that he lost 15 pounds in the 8 months spent at NCF does not in and of itself establish that the prison failed to offer him with enough food to meet his nutritional needs. Witschi v. N.C. Dep't of Pub. Safety, 2014 U.S. Dist. LEXIS 103300 *8; 2014 WL 3735135 (W.D.N.C. July 29, 2014).

Even taking as true Plaintiff's allegation that he was denied a diet that complied with what was medically-ordered, this allegation, in and of itself, does not state a claim for a constitutional violation. Generally speaking, a prison official cannot be found to be deliberately indifferent to a serious medical need based solely on a prisoner's allegation that he did not receive a special diet to accommodate a food allergy because the Constitution does not require such an accommodation. See Witschi, 2014 U.S. Dist. LEXIS 103300 at * 6 - 7, *quoting* Joseph v. Mercer Cnty. Comm'rs, No. 3:12cv847, 2012 U.S. Dist. LEXIS 171097, 2012 WL 6018125 at *13 (N.D. Ohio Dec. 3, 2012) (dismissing with prejudice prisoner's Eighth Amendment claim of deliberate indifference to his peanut allergy); McKenny v. Moore, No. 4:08-08-03705, 2008 U.S. Dist. LEXIS 120273, 2009 WL 152652 at *2 (D.S.C. Jan. 22, 2009) (examining plaintiff's food allergy claim under § 1915 and finding that plaintiff provided no factual information to indicate

that his food allergies constituted a serious medical condition and that plaintiff thus failed to the first prong of a cognizable deliberate indifference claim.).

A careful review of the record reveals that Plaintiff did receive either the "no soy" or the "renal" diet that was apparently equally acceptable to him (because it did not contain processed foods) at least for a brief period in mid-late June, 2015; again from July 11, 2015 through August 25, 2015; again from September 15, 2015 until approximately October 11, 2015; by inference, because he did not allege that he had not received them, again, at least intermittently, between October 26, 2015 through October 29, 2015, and then got a "no soy" "renal" diet from October 29, 2015 until he was transferred out of NCF on February 8, 2016. Nevertheless, the intermittent "pulling" of Plaintiff's soy-free diet on the several occasions in between those dates does not impose an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life," and therefore does not establish a protected liberty interest. The Fourteenth Amendment "does not 'protect every change in the conditions of confinement having a substantial adverse impact on the prisoner.'" Blount v. Johnson, 2006 U.S. Dist. LEXIS 17300 at *10 (W.D. Va. 2006) [*quoting* Sandin v. Conner, 515 U.S. 472 (1995)]. "[P]rison is hardly known for its fine dining," and therefore the error in providing the Plaintiff herein with a regular meal instead of a soy-free meal does not "constitute an 'atypical and significant hardship in relation to the ordinary incidents of prison life.'" Id. (finding that being placed on a loaf meal did not rise to the level of a due process violation, even though Plaintiff claimed to have vomited for three days after eating the same).

Likewise, Plaintiff's claim that the Medical Defendants were deliberately indifferent for not referring him to an outside physician after his "possible" soy allergy-induced anaphylactic

shock must fail. "Although the provision of a soy diet [to a plaintiff prisoner who objects to it], as a general matter, does not violate the Eighth Amendment, it may still amount to cruel and unusual punishment if a plaintiff has a serious medical condition for which soy is contraindicated." Riley-El, *supra* at \*14 – 15, quoting Harris, 2014 U.S. Dist. LEXIS 137870 at \*16; see also Munson v. Shearing, No. 15-cv-000062-MJR, 2015 U.S. Dist. LEXIS 9123 at \*2-8 (S.D. Ill. Jan. 27, 2015)(Reagan, J.) (allowing prisoner to proceed with claim that prison officials subjected him to unconstitutional conditions of confinement because they refused to test him for a soy allergy or provide an alternative diet).  Here, not only is Plaintiff's soy "allergy" self-diagnosed, the Medical Defendants repeatedly provided him with a no-soy or renal (no processed foods) diet anyway; further, each time he complained that it was interrupted, they made every effort to reinstate it, often on the same day.

Finally, the American College of Allergy, Asthma, and Immunology reports that the symptoms of soy allergy are

> rash or hives (urticaria); itching in the mouth; nausea, vomiting or diarrhea; stuffy or runny nose; and/or wheezing or other asthma symptoms. Rarely, a soy allergy will cause anaphylaxis, a potentially fatal reaction in which the throat swells up, ***blood pressure drops and breathing is impaired, requiring immediate treatment with epinephrine, using an auto-injector, to reverse these symptoms***.

See Soy Allergy, *available at*  http://acaai.org/allergies/types/food-allergies/types-food-allergy/soy-allergy (emphasis added).  Plaintiff's description of his "anaphylactic" episode does not include any allegation that the inside of his throat swelled up, restricting his airway, wheezing or other asthma-type symptoms, or that his blood pressure *dropped* precipitously. To the contrary, Plaintiff alleges that his blood pressure during the incident was *high,* i.e., a systolic reading of "140 – 150 or so" [ECF No. 68 at 15] or alternatively, "180 over 100."  ECF No. 54-1

at 1. (Elsewhere in the record, Plaintiff contends that his blood pressure during this episode was "180 over 100 [ECF No. 54-1 at 1] and elsewhere still, that his pulse was "180 over around 140 or higher." ECF No. 27-8 at 4. The undersigned presumes Plaintiff was referring to his blood pressure, not his pulse.). *High* blood pressure is inconsistent with anaphylactic or any other type of shock. Further, his self-described symptoms of "extreme chest pain, hard, labored breathing, twitching of left side of face . . . and left calf muscle, shooting/stabbing pain in right arm" are not consistent with anaphylaxis. Moreover, nowhere does Plaintiff allege that he required immediate treatment with epinephrine, let alone any other medication, to reverse his symptoms. Given all this, it is unlikely that whatever he experienced on October 24, 2015 was anaphylactic shock. Moreover, by Plaintiff's own admission, he received immediate medical care for the incident and was observed for 24 hours in medical and seen by "PA Christy." Thus, it is clear that the Medical Defendants were not indifferent to his serious medical needs.

It appears then, that the plaintiff really takes issue with the type of treatment he received. In other words, Plaintiff merely disagrees with the Medical Defendants as to his diagnosis or course of treatment. However, that is not sufficient grounds to state a claim of deliberate indifference. There is simply no evidence to establish that the Medical Defendants ever intentionally deprived the plaintiff of adequate medical care or dietary recommendation, or that they did so with a "sufficiently culpable state of mind." Thus, Plaintiff has failed to state a claim upon which relief can be granted, establishing that the Medical Defendants were deliberately indifferent to his serious medical needs.

**3) Kelly Strickland, Aramark Supervisor**

Plaintiff alleges that on September 15, 2015, he was informed by "NP Kristie" that it was a "mistake" that his no-soy diet had been "pulled" again, and that it was Defendant Strickland who had "pulled" the diet because almost 70% of the proceed foods contained soy. ECF No. 27 at 10. Plaintiff protested that because Strickland was not a clinical or medical employee, she had no authority to countermand the medical staff's diet order. After the issue was corrected, Plaintiff contends he received the correct tray for about a month, when "new diet cooks" took over in the kitchen and "due to Kelly Strickland's negligence," he started receiving the wrong trays again. Id.

In response, Strickland contends that Plaintiff failed to exhaust his administrative remedies against her; did not allege sufficient facts to state an Eighth Amendment claim of deliberate indifference against her; any Fourteenth Amendment claim against Strickland should be dismissed, because her conduct was not deliberate or intended to deprive him of a constitutional right; plaintiff failed to demonstrate a serious medical need or a serious deprivation of a basic human need, necessary to bring a § 1983 claim against her; and that she cannot be held responsible for the negligence of others under *a respondeat superior* theory. ECF No. 59.

In her reply, Strickland reiterates her argument that Plaintiff has failed to exhaust his administrative remedies regarding his claims against her and notes that despite Plaintiff's claims to the contrary, he has attached no grievances referencing her. ECF No. 72 at 1 – 2. Further, she reiterates her other arguments.

Under the Prison Litigation Reform Act (PLRA), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983, or any other federal law, must first exhaust

all available administrative remedies. 42 U.S.C. § 1997(e)(a). Exhaustion as provided in § 1997(e)(a) is mandatory and "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes," [see Porter v. Nussle, 534 U.S. 516, 524 (2002)], and is required even when the relief sought is not available. Booth v. Churner, 532 U.S. 731, 741 (2001). Because exhaustion is a prerequisite to suit, all available administrative remedies must be exhausted *prior to* filing a complaint in federal court. See Porter v. Nussle, 534 U.S. 516, 524 (2002) (citing Booth at 741) (emphasis added).

Moreover, in Woodford v. Ngo, 126 S.Ct. 2378, 2382 (2006), the United States Supreme Court found that the PLRA's exhaustion requirement serves three main purposes: (1) to "eliminate unwarranted federal court interference with the administration of prisons;" (2) to "afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case;" and (3) to "reduce the quantity and improve the quality of prisoner suits." Therefore, "the PLRA exhaustion requirement requires *full* and *proper* exhaustion." Woodford, 126 S.Ct. at 2387 (emphasis added). Full and proper exhaustion includes meeting all the time and procedural requirements of the prison grievance system. Id. at 2393.

In Jones v. Bock, 549 U.S. 199 (2007), the United States Supreme Court ruled, among other things, that an inmate's failure to exhaust under the PLRA is an affirmative defense, and an inmate is not required to specifically plead or demonstrate exhaustion in his complaint. However, that decision does not abrogate the fact that an action under 42 U.S.C. § 1983 is subject to exhaustion of administrative remedies as required by the PLRA. Nor does it abrogate well-established Fourth Circuit precedent which allows the Court to summarily dismiss a

complaint in which the failure to exhaust is clearly evident. <u>Anderson v. XYZ Correctional Health Services</u>, 407 F.3d 674 (4th Cir. 2005).

The WVDOC has established a three level grievance process for prisoners to grieve their complaints in an attempt to resolve prisoners' issues. The first level involves filing a G-1 Grievance Form with the Unit Supervisor. If the inmate receives no response or is unsatisfied with the response received at Level One, the inmate may proceed to Level Two by filing a G-2 Grievance Form with the warden/administrator. Finally, the inmate may appeal the Level 2 decision to the Commissioner of the Division of Corrections.

Here, despite Plaintiff's claim to the contrary in his response to Strickland's dispositive motion, a careful review of the record corroborates Strickland's contention that Plaintiff never filed any grievance naming her or alleging any action or inaction on her part. Although Plaintiff did file several grievances protesting the NCF kitchen's interruption of his no-soy diet, he never alleged that any action or inaction on Strickland's part was to blame.

Despite the fact that the Supreme Court has stated that it "will not read futility or other exceptions into statutory exhaustion requirements . . . " <u>see</u> <u>Booth v. Churner</u>, 532 U.S. at 741, n. 6, several courts have found that the mandatory exhaustion requirement may be excused in certain limited circumstances. <u>See</u> <u>Mitchell v. Horn</u>, 318 F.3d 523, 529 (3d Cir. 2003) (summary dismissal for failure to exhaust not appropriate where prisoner was denied forms necessary to complete administrative exhaustion); <u>Ziemba v. Wezner</u>, 366 F.3d 161 (2nd Cir. 2004) (defendant may be estopped from asserting exhaustion as a defense, where the defendant's actions render the grievance procedure unavailable); <u>Aceves v. Swanson</u>, 75 Fed.Appx. 295, 296 (5th Cir. 2003) (remedies are effectively unavailable where prison officials refuse to give inmate grievance

forms upon request); <u>Miller v. Norris</u>, 247 F.3d 736, 740 (8th Cir. 2001) (a remedy is not available within the meaning of § 1997e(a) when prison officials prevent a prisoner from utilizing such remedy); <u>Dotson v. Allen</u>, 2006 WL 2945967 (S.D. Ga. Oct. 13, 2006) (dismissal for failure to exhaust not appropriate where Plaintiff argues that failure to exhaust was direct result of prison official's failure to provide him with the necessary appeal forms). To the extent, therefore, that exhaustion may be waived, the plaintiff has failed to set forth any accepted reason to excuse his failure to exhaust. Accordingly, any claim against Strickland should be dismissed.

**B. <u>Medical Negligence</u>**

In his complaint, plaintiff asserts that his self-diagnosed soy "allergy" causes serious gastrointestinal ("GI") problems "almost" every time he consumes foods containing soy [ECF No. 68 at 8], including vomiting, diarrhea, fatigue, abdominal pain, weakness, light-headedness [<u>id.</u> at 15], at least 15 pounds weight loss [<u>id.</u> at 8 and 11], and on one occasion, he may have suffered a reaction commensurate with "possible" anaphylactic shock. <u>Id.</u> at 11. He contends that instead of providing appropriate care, a Prime Care nurse told him "there is no such thing as a soy allergy." <u>Id.</u> at 8. Further, he contends that he was denied any medicine to treat the violent vomiting he experienced within 20 minutes of consuming soy. <u>Id.</u> at 15. He alleges that despite filing grievances to obtain a "true health screening or 'certificate of health' due to all that has occurred . . . [he has not] had a real evaluation or even a physical [because] NCF does not provide adequate medical treatment." <u>Id</u>. at 11. He contends that NCF and Wexford make prisoners wait 3-4 weeks to be seen after they file for "sick call," instead of the required 24-72-hour wait. <u>Id.</u> He contends that as a result of all of the defendants' negligence and disregard for his health, he suffered greatly and his health was placed at risk. <u>Id.</u> at 12 – 13.

41

The Medical Defendants aver Plaintiff's claims should be dismissed; they admit that in furtherance of his medical malpractice claim, Plaintiff did file a notice of claim prior to filing suit, but note that he did not file a screening certificate of merit along with it. ECF No. 35 at 5.

To the extent that Plaintiff may be seeking to establish a medical negligence claim, he must comply with West Virginia law and establish that:

> (a) the health care provider failed to exercise that degree of care, skill, and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and (b) such failure was a proximate cause of the injury or death.

W.Va. Code § 55-7B-3.

When a medical negligence claim involves an assessment of whether or not the plaintiff was properly diagnosed and treated and/or whether the health care provider was the proximate cause of the plaintiff's injuries, expert testimony is required. <u>Banfi v. American Hospital for Rehabilitation</u>, 529 S.E.2d 600, 605-606 (2000).

Additionally, under West Virginia law, certain requirements must be met before a health care provider may be sued. W.Va. Code §55-7B-6. This section provides in pertinent part:

**§55-7B-6**. Prerequisites for filing an action against a health care provider; procedures; sanctions.

> (a) Notwithstanding any other provision of this code, no person may file a medical professional liability action against any health care provider without complying with the provisions of this section.

> (b) At least thirty days prior to the filing of a medical professional liability action against a health care provider, the claimant shall serve by certified mail, return receipt requested, a notice of claim on each health care provider the claimant will join in litigation. The notice of claim shall include a statement of the theory or theories of liability upon which a cause of action may be based, and a list of all health care providers and health care facilities to whom notices of claim are being sent, together with a screening certificate of merit. The screening certificate of merit shall be executed under oath by a health care

provider qualified as an expert under the West Virginia rules of evidence and shall state with particularity: (1) The expert's familiarity with the applicable standard of care in issue; (2) the expert's qualifications; (3) the expert's opinion as to how the applicable standard of care was breached; and (4) the expert's opinion as to how the breach of the applicable standard of care resulted in injury or death. A separate screening certificate of merit must be provided for each health care provider against whom a claim is asserted. The person signing the screening certificate of merit shall have no financial interest in the underlying claim, but may participate as an expert witness in any judicial proceeding. Nothing in this subsection may be construed to limit the application of rule 15 of the Rules of Civil Procedure.

This Court previously held that compliance with W.Va. Code §55-7B-6 is mandatory prior to filing suit in federal court. See Stanley v. United States, 321 F.Supp.2d 805, 806-807 (N.D. W.Va. 2004).

With regard to the appropriate standard of care, Plaintiff has not sustained his burden of proof. Plaintiff does not assert, much less establish, the standard of care for treatment of a soy allergy. Further, this is not a case of alleged malpractice so obvious that it entitles Plaintiff to the common knowledge exception of W.Va. Code §55-7B-6(c). Thus, any possible claims as to medical negligence must be dismissed.

## V. Recommendation

For the reasons stated above, the undersigned hereby recommends that the defendants Hill, Pszcolkowski, Rubenstein, Thornton's Motion to Dismiss [ECF No. 34] be **GRANTED;** that defendants Johnson, Lee, Musilli, Sabtino, and Schmitt's Motion to Dismiss [ECF No. 49] be **GRANTED;** and defendant Strickland's Motion to Dismiss [ECF No. 59] be **GRANTED;** and Plaintiff's complaint be **DENIED and DISMISSED with prejudice**.

**Within fourteen (14) days** after being served with a copy of this Report and Recommendation, any party may file with the Clerk of Court written objections identifying those

portions of the recommendation to which objection is made and the basis for such objections. A copy of any objections shall also be submitted to the United States District Judge. **Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation**. 28 U.S.C. §636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk is also directed to mail a copy of this Report and Recommendation to the *pro se* plaintiff by certified mail, return receipt requested, to his last known address as reflected in the docket sheet, and to transmit a copy electronically to all counsel of record.

DATED:  October 19, 2016

/s/ James E. Seibert_____
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE